Filed 12/15/14  Monterrosa v. Broussard-Dawson CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOSE A. MONTERROSA,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>AMY SELENA BROUSSARD-DAWSON, et al.,<br><br>        Defendants and Appellants. | B247033<br><br>(Los Angeles County<br>Super. Ct. No. NC056003) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rhonda Rosales, Judge.  Affirmed.

Law Offices of Cleidin Z. Atanous, Cleidin Z. Atanous and Michelle L. Villarreal for Defendants and Appellants.

Steven B. Stevens; The Vartazarian Law Firm and Steven R. Vartazarian for Plaintiff and Respondent.

_____

In October 2010, Jose Monterrosa (plaintiff) was driving on the freeway in Long Beach when he was rear-ended by a vehicle driven by Amy Selena Broussard-Dawson (Amy). Plaintiff sustained injuries and was taken to the Long Beach Memorial Medical Center. Plaintiff was treated thereafter by Dr. Asad Michael Moheimani, an orthopedic surgeon. In May 2011, plaintiff filed a lawsuit against Amy and her husband Robert Dawson (Robert) for injuries he sustained. A jury trial commenced on September 4, 2012. The jury found Amy was negligent and awarded plaintiff damages of $163,359.55. Amy and Robert (collectively referred to as defendants) appealed, contending the trial court erred in allowing plaintiff to present a video animation of how his head was injured.

*FACTUAL & PROCEDURAL BACKGROUND*

Prior to trial, plaintiff's counsel proposed to introduce into evidence a video to depict a closed-head trauma and brain injury. Counsel described the video as follows: "It's three minutes long and depicts a soft tissue head injury. The plaintiff was diagnosed with a moderate to severe concussion and my witness prepared an animation on top of what his words can't do. I don't have—if they have an issue, I believe it's helpful to the jury to understand what the damages are." Defendants' counsel made a motion to exclude the video because it lacked foundation and showed much more than what Dr. Moheimani had testified to in his deposition.

On September 4, 2012, the court ruled as follows: "You can show it. It's really no different than a medical-legal drawing showing impact and movement of the skull because you went the extra step and made it more palatable to the jury. [¶] However, that last portion concerning the injury to the brain, you have to take that out. And also for the record, it's all silent. Nobody is saying anything. If your client is going to testify this was the movement of his head, front movement, side movement, et cetera, and the doctor testifies it's consistent with the findings, it's admitted."

At trial, plaintiff testified that at the time of the accident, Amy's car hit his car from the rear, and plaintiff's car then hit the car in front of him. Plaintiff said he hit his head on the inside of the car, describing the location of the impact as follows: "It has like a handle over here and part of that goes to the window and hit my head over the

2

window." He then blacked out, but did not know for how long. Someone knocked on the car window and someone else helped him out. He declined the Highway Patrol officer's offer to call an ambulance, but later went on his own to Long Beach Memorial Hospital where they took a CT scan and gave him medication. He subsequently went to UCLA Harbor Medical Center to seek treatment for headaches and pain. He then consulted with a family doctor who referred him to a chiropractor who treated him for neck and back pain. The chiropractor referred plaintiff to Dr. Moheimani.

Dr. Moheimani testified that he was treating plaintiff and had reviewed his complete medical records.

Dr. Moheimani attended medical school at the Ohio State University College of Medicine. He was an intern and resident at Michigan State University, where he had clerkships in internal medicine, obstetrics, gynecology and surgery. His residency was in orthopedics, treating musculoskeletal injuries. After his residency he did his fellowship in scoliosis and adolescent sports medicine. He became a Board certified orthopedic surgeon specializing in spine, knee and shoulder injuries.

During his testimony, the following colloquy occurred: "[Plaintiff's counsel]: Are you familiar with how the head moves in a collision being an orthopedic surgeon? [¶] A. Yes. [¶] Q. I'd like to show you what we're going to mark as Plaintiff's 8. It's an animation of a head injury for demonstrative purposes. [¶] The Court: Ladies and gentlemen, they're going to show you an animation. This is not the plaintiff's skull that you're seeing. It's just an animation, so you have to understand that. Fair enough. [¶] Go ahead. [¶] [Plaintiff's counsel]: Doctor, I have a little pointing thing here. . . Doctor, we prepared an animation here so the jury can understand what happed to [plaintiff], what happened in the collision. It's silent, so if you can narrate what you see, we'd appreciate it. Doctor, tell us what's going on. [¶] A. It's demonstrating what typically happens in a whiplash injury, which is somebody is hit from behind."

Dr. Moheimani described the animation by saying: "Your brain is in a jar. As it moves forward, the brain sloshes. It will hit and impact the bone of the skull and the brain is very soft and thrown forward." He admitted he was not present at the accident.

3

He described the grey matter (neurons) and the white matter depicted in the animation and said that with a head injury "your wiring isn't working." He explained how this sort of injury causes headaches, dizziness and blurred vision. He described plaintiff as having a head injury and his "mental state was not normal," referring to plaintiff's documented headaches and dizziness.

When asked if the animation showed the same type of injury plaintiff had sustained, Dr. Moheimani replied, "I think it's a fair representation for somebody that's not familiar, for like a jury, that would want to know what happened. . . ."

Dr. Moheimani then testified about plaintiff's spinal and neck injuries in detail with a model of a spine. He also testified in detail about the epidural procedure plaintiff received. He reviewed pictures from plaintiff's MRI results.

On cross-examination, when asked about plaintiff's headaches, Dr. Moheimani testified that headaches can be due to neck injury or concussions.

In closing, plaintiff's counsel made the following references to the video: "You saw the animation of the head injury, the dizziness, back pain, would you want him on the road with you or your family members in that condition driving a big rig with a container on it driving from Long Beach?"

The video was never admitted into evidence. There is no indication the jury ever asked for, or about, the video during deliberations. [1]

*CONTENTIONS ON APPEAL*

Defendants contend on appeal that the animation was not a fair and accurate representation of the evidence, there was no underlying testimony or physical data to lay a proper foundation for the video, and there was no engineering or biomechanical analysis to support the depiction of the accident. They also contend that because the

---

[1] The complete trial transcript was not provided. Apparently two other medical witnesses testified (one for plaintiff, one for the defense) but their testimony was not included in the record on appeal. Defendants contend the omitted testimony was not relevant to the issues on appeal.

concussion was undisputed, the video did not resolve an issue in dispute and was therefore unnecessary and any probative value was outweighed by its prejudicial effect. They argue that the animation was so prejudicial it resulted in a higher award for damages. They contend the animation inaccurately depicted the evidence because the impact to plaintiff's head was from the rear whereas the animation depicted a side-to-side movement. Finally, they contend the court failed to give an adequate limiting instruction to the jury before the video was played.

*DISCUSSION*

The video shows three different types of impact, front, rear and side to side, and shows what would be referred to as a "coup" and a "contra coup" for each type of impact. It depicted where the white matter and grey matter are in the brain. It showed how a normal brain transmission works and what happens after an injury and what is known as axonal shearing. It identified certain parts of the brain and showed an elementary schematic of brain function. It defined basic medical terms and brain anatomy.

The video clearly showed a simplified sketch of parts of the brain and did not indicate a picture of plaintiff's brain or a demonstration of his particular injuries. It did not state it was a re-creation of plaintiff's accident and clearly was a demonstration of different types of head impacts.

Defendants first contend there was no foundation for the video. They also contend the animation was not relevant, was inaccurate and was unduly prejudicial. However, after examining the record, we conclude they forfeited these claims on appeal.

Failure to raise a timely and specific objection forfeits review of the error on appeal. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1122; see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265.) "The requirement of an objection is premised upon the idea that a party should not sit on his or her hands, but instead must speak up and provide the court with an opportunity to address the alleged error at a time when it might be fixed." (*Id.* at p. 266.).)

When defendants' counsel moved in limine to exclude the video, the court conditionally denied it, making its ruling depending on whether Dr. Moheimani testified

5

the movement of plaintiff's head was consistent with what was depicted on the video. But when the video was played at trial, defendants' counsel did not object.

When plaintiff's counsel was questioning Dr. Moheimani on direct examination, he asked if the animation showed the "same injury" as plaintiff's. Defendants' counsel objected on the grounds the question called for speculation.

When cross-examining Dr. Moheimani at trial, defendants' counsel did not ask about or object to the video on foundational grounds. He did not ask Dr. Moheimani about his specific training or qualifications in treating injuries, or who prepared the animation or what information was used in preparing the animation. Defendants' counsel did not object to the video for lack of relevance or on the grounds it was unduly prejudicial.

Defense counsel's objection on grounds of speculation was inadequate to preserve the admissibility issues for appeal. (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) Moreover, counsel made no reference to any claimed dissimilarity of the injuries to the accident and did not question Dr. Moheimani about how the animation was created. *(People v. Barnett, supra*, 17 Cal.4th at p. 1122.)

In any event, even if all claims had been preserved for review, we would conclude there was no error.

According to *People v. Duenas* (2012) 55 Cal.4th 1, we evaluate an animation by determining whether (1) it accurately represented the expert's opinion, (2) it depicted demonstrative evidence used to help the jury understand the expert's testimony, (3) it created an improper air of scientific certainty, or (4) it was improperly referred to as proof of the injuries sustained.

Dr. Moheimani properly laid a foundation for his testimony. He testified he was a medical doctor, a "qualified medical examiner" for workers compensation cases, and a medical instructor at schools and hospitals. He testified he frequently saw patients with neck and back injuries. He testified he was familiar with how the head moves in a collision.

6

Dr. Moheimani referred to the video to illustrate how the brain moves inside the skull during the collision and how the impact affected the wiring of the brain. For that reason, it was properly used to help the jury understand his testimony. It was made clear to the jury that it was not a depiction of the specific injuries plaintiff suffered and therefore did not create an air of scientific certainty nor was it referred to as proof of his injuries.

Defendants also contend the animation was not relevant because it was undisputed that plaintiff suffered a concussion.

The video showed a very simplified depiction of the basic anatomy of the brain and how it moved within the skull. It also showed how the wiring of the brain is affected, explaining how the physical injury caused plaintiff's headaches and dizziness. We conclude it was directly relevant to the testimony and to the issue of damages.

Defendants contend the video was inaccurate because it showed a side-to-side impact rather than the front-to- back injury plaintiff suffered. This is an inaccurate description of the video. The video showed different types of head injuries and did not purport to show only the injury which plaintiff received. Secondly, plaintiff testified that his head hit the front window near the handle, which appears to describe the area near the front door of the car, not on the windshield. Therefore, the impact was to the side and not necessarily a straight front-to-back impact. Because the video showed a front impact as well as a side impact, the trial court did not abuse its discretion in allowing the video to be played.

Defendants contend the video was prejudicial, causing the jury to award excessive damages. We find this contention to be meritless. The video was clearly an animation, not a film of an actual brain, nor did it depict real people. It was clearly simplified to illustrate basic anatomical and medical terms, and did not purport in any way to show pain, suffering, or actual distress. As in *People v. Hood* (1997) 53 Cal.App.4th 965, 971-972, this video was "clinical and emotionless." We find no undue prejudice caused by showing the video.

7

Finally, we do not reach the merits of defendants' claim that additional instructions to the jury were necessary. The court indicated that the video could be admitted if Dr. Moheimani testified that it depicted the movement of plaintiff's head. Dr. Moheimani did not testify that it was the same movement of plaintiff's head, he stated only that the video was a "fair representation" for someone who would want to know what happened. The court instructed the jury it was "not the plaintiff's skull you're seeing. It's just an animation." To the extent that defendants believed a further instruction was warranted telling the jury that the video was not a reproduction of the movement of plaintiff's head, they have forfeited their right to raise that issue on appeal. Furthermore, defendants did not provide us with any record of the jury instructions, either in the clerk's or reporter's transcripts. Therefore we cannot determine whether additional instructions were proposed or refused, nor whether the instructions given adequately addressed the issues. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1671-1672; *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532.)

*DISPOSITION*

The judgment is affirmed. Plaintiff to recover costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                                    **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

8